UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NEXTEP SYSTEMS, INC.,

                Plaintiff,                CASE NUMBER: 10-14473
                                                HONORABLE VICTORIA A. ROBERTS

v.

OTG MANAGEMENT, INC.,

                Defendant.

_____/

## ORDER DENYING PLAINTIFF'S
## MOTION FOR PRELIMINARY INJUNCTION

### I.  INTRODUCTION

This matter is before the Court on Plaintiff's Motion for a Preliminary Injunction, pursuant to Fed. R. Civ. P. 65(a).  Plaintiff seeks to enjoin Defendant from using a third-party vendor to carry out a project to install self-order hardware and software at United States' airports, which, Plaintiff argues, would violate an exclusivity agreement between Plaintiff and Defendant.  Oral argument was heard August 30, 2011.

The Court **DENIES** Plaintiff's Motion for a Preliminary Injunction.

### II.  FACTS AND PROCEDURAL HISTORY

Plaintiff Nextep Systems, Inc. ("Nextep") manufactures and designs computer software and hardware for self-order products and services to the restaurant, concession, and hospitality industries.  Defendant, OTG Management ("OTG"), operates restaurants, bars, food courts, eateries, markets, cafes and delicatessens at

1

airports throughout the United States.

In August 2006, Nextep and OTG entered into an agreement for Nextep to supply OTG with self-order kiosks and menu boards for installation at a deli OTG operated at JFK International Airport. The project was successful, and in April 2008 the parties signed an Addendum to the 2006 Agreement in connection with approximately 252 Nextep self-order kiosks and digital menu boards that Nextep was to provide to Terminal 5 of the JFK International Airport ("JFK"). (Doc. 21-3, T5 Addendum).  Under the Addendum, OTG was permitted to re-brand Nextep's software as its own, removing all of Nextep's proprietary marks, and the goodwill associated with them, from its software displays.  In exchange, OTG agreed to use Nextep as its exclusive vendor for self-order hardware and software at any transportation facility in the United States for five years, from April 23, 2008 to April 23, 2013, provided that pricing for the products was comparable to the pricing set forth in the T5 Addendum and otherwise competitive in the marketplace.

In August 2010, OTG decided to develop the iPad as a digital menu.  In October 2010, Nextep learned that OTG was working with Delta Airlines ("Delta") and another vendor, Fending Group, on an iPad project at LaGuardia Airport ("LaGuardia").  Nextep notified OTG in writing that OTG was in breach of the exclusivity provision of the Addendum by engaging a third-party to provide self-order hardware and software at LaGuardia.  On October 25, 2010, OTG requested that Nextep provide a quote for iPad software to be used at Terminals 2 and 3 of the JFK and LaGuardia.  Three days later, Nextep submitted its quote, which was significantly higher than that of Fending Group. OTG hired Fending Group for the iPad project.

2

In November 2010, Nextep filed suit in Oakland County Circuit Court.  OTG removed to this Court pursuant to diversity of citizenship.  On November 18, 2010, Nextep moved for a preliminary injunction to enjoin the OTG-Fending Group project.  On February 11, 2011, Nextep voluntarily withdrew the motion.  On April 5, 2011, Nextep filed a Second Amended Complaint; the Complaint alleges breach of contract, misappropriation of trade secrets, conversion, and unfair competition, and seeks damages and injunctive relief. (Doc. # 21).

At a status conference on July 6, 2011, Nextep learned that OTG planned to issue a request for proposal ("RFP") to rebid the entire program, and that OTG was awarded a contract at St. Paul International Airport in Minneapolis for self-order hardware and software.  OTG requested that Nextep respond to an RFP.  Nextep objected, arguing that the RFP procedure was in breach of the parties' Addendum.  (Doc. # 32, Exh. B).  Nextep demanded that OTG "immediately rescind the RFP and notify anyone who received it of this rescission, and take steps to begin good faith discussions with Nextep as required by the Addendum." (*Id.*).  OTG responded that the issuance of the RFP did not violate the Addendum and that it would not discontinue the process.  (*Id.*).

On July 29, 2011, Nextep proposed a quote in response to the RFP.  (*Id.*, Exh. C).  On August 2, 2011, OTG informed Nextep that it awarded the project to another vendor, Control Group.  (*Id.*, Exh, D).  Nextep says OTG indicated it plans to replace all of the Fending Group iPads installed at LaGuardia and JFK with the iPad products solicited in the RFP.  Nextep further states:

Now that [OTG] has decided to replace its Fending Group iPad solution,

3

> [Nextep] again has an opportunity to remain the exclusive provider to
> Defendant of self-order hardware and software as contemplated by the
> Addendum.  If [OTG] is permitted to replace [Nextep], and substitute its
> own iPad product, [Nextep] will be denied this opportunity, and the main
> reason for the Addendum will be permanently and irreparably frustrated.

(Doc. # 32 at 3).

On August 5, 2011, three days after OTG awarded the RFP project to Control

Group, Nextep filed this motion for preliminary injunction. (Doc. # 32).  Nextep asks the

Court to enjoin OTG from:

> (1) using any vendor other than Plaintiff to develop an iPad self-ordering
> device for use at LaGuardia Airport, or at any other transportation facility
> in the United States, until April 2013, or any other self-ordering hardware
> or software at any transportation facility in the United States until April
> 2013; and
> (2) using any vendor other than Plaintiff to provide the iPad self-ordering
> device solicited in the RFP which is the subject of this Motion.

(Doc. # 32 at 4).  OTG responded in opposition (Doc. # 35), and Nextep replied. (Doc. #

38).

## III.    PARTIES' ARGUMENTS

### A.    Nextep

Nextep seeks an injunction in connection with its breach of contract claim.

Nextep argues that OTG breached the parties' exclusivity agreement, Section 4 of the

Addendum, by selecting vendors other than Nextep for the iPad project.  Nextep says

OTG's Director of Technology admitted it no longer wanted to pay Nextep license fees,

and wanted to own the iPad product being developed by Fending Group.  (Doc. # 32 at

5).  Nextep contends, by engaging Fending Group, and now Control Group, to supply

iPad self-ordering hardware and software, OTG breached the Addendum.  It says these

products and services are clearly within the scope of the Addendum and Nextep's

4

pricing was comparable to the pricing set forth there, and otherwise competitive in the marketplace for like products.

Nextep states:

> Defendant has never rejected Plaintiff's quotes on the basis that they are inconsistent with Plaintiff's previous pricing on the T5 project or not competitive with pricing for similar products in the marketplace. Defendant rejected Plaintiff's initial quote on the basis that it was not competitive with the quote from the Fending Group. Because the Fending Group did not quote a product comparable to Plaintiff's, Defendant's rejection of Plaintiff's initial quote was objectively unreasonable, and therefore a breach of the parties' agreement....Defendant's rejection of Plaintiff's current quote is unreasonable because it was done without any effort on Defendant's part to comply with the Addendum. Simply put, Defendant has no right to go to other vendors until after it is established that its exclusive vendor, Plaintiff, is unable to provide the self-order product on the terms set forth in the Addendum.

(*Id.* at 6-7).

 In support of its motion for preliminary injunction, Nextep argues it is likely to succeed on the merits; it will suffer irreparable harm if the injunction does not issue; the injunction will not harm others; and public interest will be served by the injunction.

Nextep says it will likely succeed on the merits because the evidence shows that OTG breached the parties' non-exclusivity agreement by acting as if the Addendum does not exist. (*Id.* at 8). Nextep alleges it will sustain irreparable injury without an injunction because OTG's breach will interfere with Nextep's customer relationships and deprives Nextep of the benefit of what it bargained for when it agreed to allow OTG to remove its proprietary marks, name, and logo from its products. (*Id.* at 9-10). Nextep asserts, "Defendant's exclusivity obligations under the Addendum are significant to Plaintiff both as a sales opportunity and, more importantly, as a branding and marketing opportunity within the entire domestic transportation industry." (*Id.* at 10).

5

Nextep acknowledges that Control Group might be harmed by an injunction, but then reasons, "any damage to the vendor is the result of Defendant's breach of the Addendum and cannot be used as a bootstrap to deny a request for preliminary injunction." (*Id.* at 11). Finally, Nextep states the public interest in the "enforcement of voluntarily assumed contractual obligations" would be served by issuance of a preliminary injunction. (*Id.*). Nextep says OTG will begin implementing the RFP on September 15, 2011 and requests expedited hearing. (*Id.* at 12).

**B.     OTG**

OTG provides multiple reasons for why it believes the Court should not issue an injunction. It says Nextep fails to meet its burden to show that the four factors it must satisfy for an injunction weigh in its favor. (Doc. # 35 at 4).

First, OTG argues, to the extent Nextep seeks to enjoin OTG from using another vendor to provide the iPad self-ordering device solicited in the RFP, the relief is moot because OTG already awarded the RFP to Control Group to develop the software. (*Id.*). The request for broader relief is moot as well, OTG contends, because OTG previously engaged Fending Group to develop self-ordering software. (*Id.* at 4-5).

Next, OTG asserts Nextep's requested relief impermissibly seeks "full relief" in the guise of a preliminary injunction. (*Id.* at 7). It says,

> Nextep's requested preliminary injunction does not seek to 'preserve' the status quo, but rather attempts to (1) undo OTG's already-completed transactions with Control Group and Fending Group, and (2) require OTG to use only Nextep to develop self-ordering devices. The requested injunction is precisely the same as the final relief sought by Nextep in this case....Accordingly, the grant of the preliminary injunction would be inappropriate at this stage in the proceedings.

(*Id.*).

6

OTG's third contention is that Nextep cannot demonstrate "irreparable harm" because it fails to show the alleged harm is "actual" and "imminent" and because any harm can be remedied by monetary damages.  (*Id.* at 8).  OTG argues there was no non-compete agreement between Nextep and OTG such that Nextep's reliance on *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 550 (6th Cir. 2007) is misplaced.  OTG also claims Nextep does not identify any specific existing or future business relationships that are, or will be, affected by its purported breach, or why those losses cannot be measured by money damages.  OTG argues that any damages sustained by Nextep are easily quantified and that during discovery "Nextep provided a very detailed, line-item list of money damages allegedly incurred when OTG selected the Fending Group's lower-bid for the JFK Terminal Project."  (*Id.* at 11).

Next, OTG contends Nextep cannot demonstrate a substantial likelihood of success on the merits because OTG did not violate the Addendum.  OTG says the plain language of the Addendum did not prohibit it from requesting bids from vendors other than Nextep; it says it would not be able to determine whether Nextep's bid was competitive without doing so.  (*Id.* at 12).  Nextep argues it was permitted to select Control Group over Nextep because Control Group's response to the RFP was more than fifty times lower than the Nextep bid.  (*Id.*).  It says that there was no implied covenant of good faith and fair dealing that overrides the express language of the Addendum, and even if there was, OTG did not exhibit bad faith or unfair dealing by rejecting Nextep's bid.  (*Id.* at 13).

OTG also states Nextep cannot establish that a preliminary injunction would not

7

harm third parties or that it would serve the public interest.  OTG says Control Group would be harmed by the possible loss of its contract with OTG; Delta would be affected by possible delays, or a cancellation, of OTG's agreement to provide iPads at its New York and Minneapolis terminals; and, OTG would itself be substantially harmed by an injunction because it would force it to incur extraordinary additional expense, and might force it to breach its obligations to Control Group, Fending Group, and Delta. Furthermore, OTG claims the public interest is not served by preventing the implementation of services at public airports.  (*Id.* at 15-16).

Finally, OTG says if the Court issues an injunction, Nextep must provide security in the amount of the difference between the Nextep bid and the Control Group bid, plus the costs and damages sustained in case OTG is later found to have been wrongfully enjoined.  (*Id.* at 16).

## IV.   ANALYSIS

### A.   Legal Standard

Under Fed. R. Civ. P. 65(a), a court may issue a preliminary injunction on notice to the adverse party.  "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."  *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981); *United States v. Edward & Sons*, 384 F.3d 258, 261 (6th Cir. 2004) ("The purpose of a preliminary injunction is simply to preserve the status quo.").  "Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits."  *Camenisch*, 451 U.S. at 395.  The movant need not prove its case

8

in full at a preliminary injunction hearing, and the findings of fact and conclusions of law made at this stage are not binding at trial on the merits. *Id.*

When a party moves for preliminary injunction, district courts consider four factors to determine whether to grant relief: (1) the likelihood of success on the merits of the action; (2) the irreparable harm which could result without the requested relief; (3) the possibility of substantial harm to others; and (4) the impact on the public interest. *Christian Schmidt Brewing Co. v. G. Heilman Brewing Co.*, 753 F.2d 1354, 1356 (6th Cir. 1985). "Although these four factors must be considered in assessing a request for preliminary injunction, the four factors do not establish a rigid and comprehensive test for determining the appropriateness of preliminary injunctive relief. Instead, the district court must engage in a realistic appraisal of all the traditional factors weighed by a court of equity." *Id.*

"[T]he preliminary injunction is an 'extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in the limited circumstances which clearly demand it.'" *Leary v. Daeschner*, 228 F.2d 729, 739 (6th Cir. 2000) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 811 (4th Cir. 1991)). The party moving for the injunction has the burden to show that the circumstances clearly demand it. *Overstreet v. Lexington-Fayette Urban Cnty. Gov't.*, 305 F.3d 566, 573 (6th Cir. 2002). "[T]he proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a motion for summary judgment." *Leary*, 228 F.3d at 739.

Although the Court must balance and weigh the relevant preliminary injunction considerations, "a finding that there is no likelihood of irreparable harm...or no likelihood

9

of success on the merits...is usually fatal." *CLT Logistics v. River West Brands*, No. 10-13282, — F.Supp.2d ----, 2011 WL 833802, at *12 (E.D. Mich. Mar. 4, 2011) (citations omitted). "It follows that a district court need not address all the preliminary injunction factors where fewer are dispositive of the issue." *Id.* However, "it is generally useful for the district court to analyze all four of the preliminary injunction factors" because the Sixth Circuit's analysis of one of the factors may differ from the district court's on appeal. *Leary*, 228 F.3d at 739 n. 3.

> **B.    Nextep's claim for preliminary injunctive relief is not moot.**

OTG relies on three cases to argue that Nextep's requested injunctive relief is moot: *Parsons Inv. Co. v. Chase Manhattan Bank*, 466 F.2d 869, 871 (6th Cir. 1972); *City of Romulus v. Cnty. of Wayne*, 634 F.2d 347 (6th Cir. 1980); and *Highway Equip. Co. v. Caterpillar Tractor Co.*, 779 F.2d 51, 1985 WL 13882 (6th Cir. 1985) (Table).

In *Parsons*, the Sixth Circuit explained:

> A dispute may lose its character as a case or controversy, thus rendering it moot, "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome"...or when subsequent events make it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur...or when subsequent events make it impossible for the court to grant to the prevailing party effectual relief...since "the thing sought to be prohibited has been done, and cannot be undone by any order of court."

466 F.2d at 871 (citations omitted). There, the district court order vacated a temporary restraining order entered by bankruptcy referees prohibiting the sale of the plaintiff debtors' stock, held by Chase Manhattan Bank ("Chase") as collateral for a defaulted loan. *Id.* at 870. The plaintiffs appealed the order vacating the restraining order. *Id.* The Sixth Circuit held the appeal was moot because, although the district court's order

10

allowed Chase to sell the stock before the temporary restraining order was set to expire, Chase did not do so. *Id.* at 872. Thus, "[i]nsofar as any demonstrated rights of appellants were concerned, they were therefore in fact unaffected by the order appealed from...." *Id.* The court observed that any opinion issued on the standing of the party that sought judicial review of the referees' order to do so, and on the power of the district court to intervene, would be advisory in nature and "would not affect in any practical way the controversy at hand." *Id.* at 871.

In *Romulus*, the Sixth Circuit held that the appeal of a district court order dissolving a preliminary injunction enjoining Wayne County from constructing a runway at the Detroit Metropolitan Airport was rendered moot by the intervening construction of the runway. 634 F.2d at 348. The court explained, "[t]he activities which plaintiffs seek to enjoin are over, and we are not in position to prevent what has already occurred....Therefore, we apply the familiar principle that an action is moot where the activities sought to be enjoined have already occurred and can no longer be prevented." *Id.* at 348-49.

Finally, in *Caterpillar Tractor*, the appellant sought to enjoin the appellee from terminating two contracts which permitted the appellant to provide service for, and sales of, the appellee's products. 1985 WL 13882, at *1. The district court denied the preliminary injunction and the Sixth Circuit dismissed the appeal of that order as moot. *Id.* The Sixth Circuit said the appeal was moot because the action sought to be enjoined had already occurred; the appellant already terminated the contracts and contracted with another entity for the relevant service and sales. *Id.*

OTG argues that the Court cannot enjoin it from using a vendor other than

11

Nextep to provide self-order software and hardware, including the iPad solution solicited in the RFP, because OTG already engaged Fending Group to develop the software, and Control Group to carry out the RFP project.  It argues the Court cannot undo what has been done, making the injunction moot.

There is no dispute that OTG already contracted with Fending Group and Control Group over Nextep's objections; however, whether the requested relief is moot may not be as straightforward as OTG presents it.

"It has long been settled that a federal court has no authority to 'give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it.'" *Church of Scientology of California v. United States*, 506 U.S. 9, 12 (1992) (quoting *Mills v. Green*, 159 U.S. 651, 653 (1895)).  However, in *Mills*, the Supreme Court announced:

> If a defendant, indeed, *after notice of the filing of a bill in equity for an injunction* to restrain the building of a house, or of a railroad, or of any other structure, persists in completing the building, the court nevertheless is not deprived of the authority, whenever, in its opinion, justice requires it, to deal with the rights of the parties as they stood at the commencement of the suit, and to compel the defendant to undo what he has wrongfully done since that time, or to answer in damages....But if the intervening event is owing either to the plaintiff's own act, or to a power beyond the control of either party, the court will stay its hand.

159 U.S. at 654 (emphasis added).  Likewise, language from *Parsons* suggests that a defendant should not benefit from self-dealing:

> [W]hen, pending an appeal from the judgment of a lower court, *and without any fault of the defendant*, an event occurs which renders it impossible for this court, if it should decide the case in favor of the plaintiff, to grant him any effectual relief whatever, the court will not proceed to a formal judgment, but will dismiss the appeal.

466 F.2d at 872 (emphasis added).

12

OTG is not entitled to benefit from the mootness doctrine, with respect to its decision to award the RFP project to Control Group, because Nextep sought injunctive relief when it filed its Second Amended Complaint, in April 2011; it also objected to the RFP process as violative of the parties' Addendum before the RFP project was awarded to Control Group on August 2, 2011.  Thus, OTG had full control over the intervening event that it says renders the requested relief moot.

Moreover, the Court is not powerless to grant Nextep any effectual relief.  Even though the RFP project was awarded to Control Group on August 2, 2011, implementation is not set to begin until mid-September.  Even if implementation has begun, not much has likely happened given the short time between the award of the RFP contract and the preliminary injunction proceedings.  Thus, the Court can enjoin implementation (or further implementation) of the RFP project until Nextep's suit has been litigated.

In *Caterpillar Tractor*, the appellant's motions to the district court and Sixth Circuit for an injunction pending appeal of the district court's order denying a preliminary injunction were denied and the appellee carried out the action the appellant sought to enjoin while the appeal was pending.  1985 WL 13882, at *1.  The Sixth Circuit noted that had the district court granted the appellant's original motion for preliminary injunction, the appellee would have been enjoined "from taking any action pursuant to its termination of the contracts."  *Id.* The Sixth Circuit did not say the relief requested in the original motion was moot, even though the contracts had already been terminated. Instead, it said that if the district court had ruled differently, the appellee would have been enjoined from taking any action on, that is implementing, the termination.  That is

13

precisely the situation we have here; while OTG already selected Control Group for the RFP project, that project has not yet been implemented.  The Court could enjoin OTG and Control Group from taking any action on the project unless OTG succeeds at a trial on the merits.

OTG's mootness argument fails.

**C.    The factors the Court must consider before issuing a preliminary injunction do not weigh in Nextep's favor.**

Although Nextep's claim to relief is not moot, the Court must evaluate the four factors identified above to determine whether a preliminary injunction should issue. These factors do not weigh in Nextep's favor.

**1.    Nextep fails to show a strong likelihood of success on the merits; OTG makes a strong argument that it was released from its exclusivity obligations by Nextep's failure to submit competitive price quotes.**

The first factor for the Court to consider is whether the plaintiff has demonstrated "a strong likelihood of success on the merits." *Tenke*, 511 F.3d at 543; *Tumblebus, Inc. v. Cranmer*, 399 F.3d 754, 760 (6th Cir. 2005).  Nextep seeks preliminary injunctive relief in connection with its Breach of Addendum claim. Thus, the Court must determine how likely it is that Nextep will succeed on the merits of this claim.  A movant is not required to prove his case in full at a preliminary injunction hearing, but to meet its burden on this factor, the movant must show more than a mere possibility of success. *Tenke*, 511 F.3d at 543.

The Sixth Circuit recognizes that the strength of the likelihood of success that need be shown will vary inversely with the degree of injury the plaintiff will suffer absent

14

an injunction.  *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985); *see also*

*Metro. Detroit Plumbing & Mech. Contractors Ass'n v. Dept. of HEW*, 418 F.Supp. 585,

586 (E.D. Mich. 1976).  As a result, when the other three factors militate in favor of

granting an injunction, the district court will not abuse its discretion in granting the

injunction "if the merits present a sufficiently serious question to justify further

investigation."  *In re DeLorean*, 755 F.2d at 1230; *see also Friendship Materials, Inc. v.*

*Michigan Brick, Inc.*, 679 F.2d 100, 105 (6th Cir. 1982) (stating that the law of equity is

traditionally flexible and that a preliminary injunction may be granted even where a

plaintiff fails to show a strong or substantial likelihood of success on the merits of the

claim, but where he at least shows "serious questions going to the merits and

irreparable harm which decidedly outweighs any potential harm to the defendant if an

injunction is issued.").

The Court must apply Michigan law to decide if Nextep meets its burden to show

a strong likelihood of success on the merits of its underlying diversity action.  *See*

*Tenke*, 511 F.3d at 541.  When interpreting contracts in a diversity action, the Court

enforces the parties' contractual governing law, *id.*, here that is Michigan.  In applying

Michigan law, this Court follows the decisions of the Michigan Supreme Court when that

court has addressed the relevant issue.  *Talley v. State Farm Fire and Cas. Co.*, 223

F.3d 323, 326 (6th Cir. 2000).  If that court has not addressed the issue, this Court must

"anticipate how [that court] would rule in the case and [is] bound by controlling decisions

of that court."  *In re Dow Corning Corp.*, 419 F.3d 543, 549 (6th Cir. 2005).

Nextep says OTG breached Section 4 of the Addendum, which states:

In consideration of the limited rebranding right set forth in paragraph 3 of

15

this Addendum, so long as Nextep is not in default under the License
Agreement, OTG shall not use any vendor other than Nextep for self order
hardware or software at any transportation facility in the United States for
five years from the date of this Addendum, provided that pricing for such
hardware and software shall be comparable to the pricing as set forth in
the T5 Addendum and otherwise competitive in the marketplace for such
products at the applicable time.

(Doc. # 21-3).

Nextep states it was not in default under the License and that its pricing was
comparable to the pricing set forth in the T5 Addendum and competitive in the
marketplace such that OTG's use of other vendors violated the exclusivity provision.
Nextep contends OTG's selection of Fending Group in September 2010 was objectively
unreasonable, even though Fending Group's bid was much lower than Nextep's bid,
"[b]ecause the Fending Group did not quote a product comparable to [Nextep's]...."
(Doc. # 32 at 6).  Further, Nextep argues OTG's selection of Control Group in
connection with the RFP project was unreasonable "because it was done without any
effort on [OTG's] part to comply with the Addendum."  (*Id.* at 7).  Nextep contends OTG
was required to establish that Nextep was unable to provide the self-order product on
the terms set forth in the Addendum before instituting the RFP process, and that OTG
was unable to do so.  It also emphasizes that its quote had to be competitive, not "the
lowest price available."  (*Id.* at 7 n. 4).

OTG does not say Nextep's pricing was not comparable to the pricing set forth in
the T5 Addendum; instead, it argues Nextep's pricing was not competitive in the
marketplace;  it was much higher than the proposals of Fending Group and Control
Group.  Because Nextep did not offer "the most favorable terms," OTG says the
Addendum permitted it to engage a third-party for the products and services

16

contemplated by the Software License. (Doc. # 35 at 12).

The proper interpretation of a contract is a question of law in Michigan. *Coates v. Bastian Bros., Inc.*, 276 Mich.App. 498, 503, 741 N.W.2d 539 (2007). "The goal of contract construction is to determine and enforce the parties' intent on the basis of the plain language of the contract itself." *St. Clair Med., P.C. v. Borgiel*, 270 Mich.App. 260, 264, 715 N.W.2d 914 (2006). "[U]nambiguous contracts are not open to judicial construction and must be enforced as written." *Rory v. Continental Ins. Co.*, 473 Mich. 457, 468, 703 N.W.2d 23 (2005). Michigan courts examine written contractual language, "and give the words their plain and ordinary meanings." *Holland v. Trinity Health Care Corp.*, 287 Mich.App. 524, 527, 791 N.W.2d 724 (2010).

A contract is ambiguous "when two provisions 'irreconcilably conflict with each other,' or 'when a term is equally susceptible to more than a single meaning.'" *Id.* (quoting *Coates*, 276 Mich.App. at 503, 741 N.W.2d 539). "Only when contractual language is ambiguous does its meaning become a question of fact." *Id.*

The parties agree that the plain language of the Addendum is unambiguous and that the exclusivity clause must be given its plain and ordinary meaning. However, they dispute whether the plain and ordinary language of the clause was violated. Nextep says it was because its pricing was competitive for the products and services it offered. OTG says it was not because Nextep's pricing was not competitive.

The court first observes that the plain language of the exclusivity clause, Section 4 of the Addendum, does not prohibit OTG from soliciting offers from vendors other than Nextep. Indeed, as OTG argues, the exclusivity agreement implicitly contemplates price comparisons by operating only to the extent that Nextep's quotes are competitive

17

in the market for self-order hardware and software.  Thus, Nextep's argument that the RFP process was itself violative of the Addendum fails.  Nextep suggested at the hearing that it did not seek to restrain the RFP process because it might not have violated the parties' agreement, but in this case it did because it was a "sham."  To the extent this argument makes a difference, it presents a question of fact for the jury to decide.

Nextep does not otherwise meet its burden to establish a strong likelihood of success on the merits, nor does it establish that the merits present a sufficiently serious question to justify more investigation.  Nextep did not adequately brief the merits.  The question of whether OTG breached the Addendum raises complex issues of contract interpretation, ambiguity, and who any ambiguity should be resolved against.  The restrictions the Addendum's exclusivity clause places on Nextep are far from clear to the Court.  At the hearing the parties disagreed about how to determine if Nextep's pricing is competitive in the marketplace; who gets to decide whether Nextep's pricing is comparable to the T5 pricing and competitive in the marketplace; whether OTG must "go to the marketplace" and negotiate with Nextep before requesting bids from other vendors; and whether the quality of other vendors' products must compare to that of Nextep's product, self-described as the "Cadillac" of electronic hardware and software solutions.

Further, Nextep made arguments at the hearing that were not made in its brief. Nextep argued that the language of the Addendum, indicating that its pricing had to be comparable to that set forth in the T5 Addendum, also meant that OTG could only request bids on products comparable to those used for the T5 project until April 2013.

18

The Court fails to see how this language creates such a requirement; OTG argues it does not.  Nextep also argued at the hearing that the Addendum obligated OTG to negotiate and deal with it in good faith and "go to the marketplace" by determining how much Nextep charges other companies for its products and services, before seeking other bids.  Again, these details are lacking from the exclusivity clause, which is short and imprecise.

The multitude of questions left unanswered by the parties' briefs, and after the hearing, counsel against issuing a preliminary injunction.  The parties say that the exclusivity clause is unambiguous, yet they interpret it differently.  When a contract allows two or more reasonable interpretations, it is ambiguous and factual development is necessary to determine the intent of the parties. *Meagher v. Wayne State Univ.*, 222 Mich.App. 700, 722, 565 N.W.2d 401 (1997). The exclusivity clause indicates that OTG is permitted to abandon exclusivity with Nextep if Nextep's "self order hardware and software" is not "competitive in the market place for such products."

The parties do not define the terms "competitive" or "marketplace," nor do they describe the products at issue beyond referring to them as self-order hardware and software.  Nextep seems to argue that although the Fending Group and Control Group quotes were significantly lower than its quotes for iPad self-order products and services, those quotes do not define the market standard because the products offered by these companies are less "expensive, robust and feature-rich" than its products.  (Doc. # 38 at 4).  Nextep complains that Control Group's response to the RFP is "not competitive in the marketplace for T5 type products."  (*Id.*). At the hearing Nextep went so far as to suggest that it sets the market standard, and OTG was obligated to look at the prices

19

Nextep charges OTG's competitors to determine competitiveness in the marketplace.

While Nextep's evaluation of the other vendors' products may be accurate, the agreement does not appear to require Nextep's pricing to be competitive in the marketplace for software and hardware as "robust and feature-rich" as Nextep's products, or for "T5-type products." Rather, Nextep's pricing must be competitive in the marketplace for self-order software and hardware at the applicable time. The Court may not alter the plain language of the Addendum by reading requirements into it that are not there. *See, e.g.*, *Holland*, 287 Mich.App. at 527, 791 N.W.2d 724 ("[M]ichigan courts honor parties' bargains and do not rewrite them."). This is what Nextep asks the Court to do by imposing a requirement that Fending Group's and Control Group's iPad self-order hardware and software have similar capabilities as Nextep's in order to relieve OTG of its exclusivity obligation.

The mere fact that a contract term is not defined does not render that term ambiguous. *Vushaj v. Farm Bureau Ins. Co. of Michigan*, 284 Mich.App. 513, 515, 773 N.W.2d 758 (2009). "'Rather, reviewing courts must interpret the terms of the contract in accordance with their commonly used meanings.'" *Id.* (quoting *Henderson v. State Farm Fire and Cas. Co.*, 460 Mich. 348, 354, 596 N.W.2d 190 (1999)). The Court may use a dictionary to determine the ordinary meaning of a word or phrase. *Id.*; *see also Cowles v. Bank West*, 476 Mich. 1, 34, 719 N.W.2d 94 (2006) ("Resort to dictionary definitions is acceptable and useful in determining ordinary meaning.").

Black's Law Dictionary defines "competition," in relevant part, as "[t]he effort of two or more parties, acting independently, to secure the business of a third party by the offer of the most favorable terms." BLACK'S LAW DICTIONARY 257 (5th ed. 1979).

20

"Competitive bidding" requires "that all bidders be placed on a plane of equality, and that they bid upon the same terms and conditions." *Id.* "Market" is defined simply as a "[p]lace of commercial activity in which articles are bought and sold." *Id.* at 874. None of these definitions requires that the other vendors' products meet the quality and capabilities of Nextep's product. Instead, as OTG emphasizes in its response, these definitions suggest that the merit of Nextep's breach of contract claim is questionable. It is undisputed that the terms of Fending Group's and Control Group's offers were more favorable to OTG than the terms of Nextep's offer. OTG emphasizes that Nextep's bid in response to the RFP was over fifty times higher than Control Group's. Likewise, Nextep and Control Group bid on the same terms and conditions that were outlined in OTG's RFP, and otherwise started on an equal plane.

Nextep may have intended the "competitive in the marketplace" pricing requirement to mean competitive with the price of products of the same caliber as Nextep's; however, that intent is not apparent from the face of the clause and the agreement must be construed and enforced as written. *Quality Prods. And Concepts Co. v. Nagel Precision, Inc.*, 469 Mich. 362, 375, 666 N.W.2d 251 (2003). Nor does Nextep provide the Court with any other definition or proof that the competitiveness requirement was met. It simply asserts, in conclusory fashion, that its price was competitive.

At this stage, the Court need not determine whether the use of the undefined phrase "competitive in the marketplace" creates an ambiguity in the Addendum language, requiring interpretation by a jury. *See Zinchook v. Turkewycz*, 128 Mich.App. 513, 521, 340 N.W.2d 844 (1983) ("Although contract construction is ordinarily a

21

question of law for the court, (citation omitted), where the language used is ambiguous or incomplete, or the circumstances are unusual, the substance of the parties' agreement is a question of fact for the jury.").  Nor must the Court decide whether there is absolutely no chance Nextep can succeed on the merits.  For purposes of this motion, the question is simply whether Nextep meets its burden to show a substantial likelihood of success on the merits of its breach of contract claim.  *See Leary*, 228 F.3d at 739 ("We note that the proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a motion for summary judgment, for example, and we therefore express no opinion as to the ultimate merits of the plaintiff's case.") (citing cases).  Nextep does not meet this burden.

2.      **Nextep can be wholly compensated by monetary damages and thus does not establish it will suffer irreparable injury absent an injunction.**

The second factor for the Court to consider is whether Nextep will suffer irreparable injury without the injunction.  *Tumblebus*, 399 F.3d at 760.  "A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages."  *Overstreet*, 305 F.3d at 578; *see also Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("The key word in this consideration is irreparable.  Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough.  The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." (citations and quotation marks

22

omitted)).  But "'an injury is not fully compensable by money damages if the nature of the plaintiff's loss would make the damages difficult to calculate.'" *Tenke*, 511 F.3d at 550 (quoting *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992)). Additionally, "[t]he injury must be both certain and great (citations omitted); it must be actual, and not merely theoretical."  *Merrill Lynch, Pierce, Fenner & Smith Inc. v. E.F. Hutton & Co., Inc.*, 403 F.Supp. 336, 343 (E.D. Mich. 1975).

Citing *Tenke*, Nextep argues that its injury from OTG's breach is difficult to quantify because of the interference with customer relationships that will result if OTG is permitted to proceed with another vendor.  Nextep says further that damages cannot be calculated because it will lose "customer goodwill," a "sales opportunity," a "branding and marketing opportunity," and "fair competition."  (Doc. # 32 at 9, 10).

OTG counters that Nextep was not given any branding and marketing rights in the Addendum and that those rights were explicitly waived.  It says that *Tenke* is inapplicable because that case dealt with a non-compete agreement and its holding was confined to that context.  OTG says Nextep fails to demonstrate that any loss of customer relationships and branding and marketing opportunities is "likely," or "actual" and "imminent," as opposed to just "possible."  Lastly, OTG states Nextep's claim can be compensated by money damages; it says Nextep provided a detailed list of money damages incurred by the OTG-Fending Group partnership and that Nextep's bid in response to the RFP provides a measure for damages in connection with the OTG-Control Group partnership.

In reply, Nextep says OTG misunderstands its irreparable harm claim.  (Doc. # 38 at 2).  Nextep states:

23

> First, in exchange for exclusivity as OTG's self-order hardware and
> software vendor, Nextep allowed OTG to brand its products installed in
> JFK Airport's Terminal 5, and take credit for Nextep's work. Second, and
> more importantly, Nextep stands to lose recognition as OTG's exclusive
> provider of self-order hardware and software within the entire domestic
> transportation industry, just at the time Nextep's successful
> implementation of the Terminal 5 project has elevated OTG to become the
> leading provider of such solutions. It is not possible to value the impact of
> this on Nextep's reputation.

(Doc. #38 at 2).

Nextep's contention that it cannot be fully compensated by monetary damages is

not compelling; *Tenke* is inapposite. In that case, the plaintiff appellant, operator of a

restoration dry-cleaning business, entered into a written franchise agreement with the

defendant appellees awarding them a franchise to operate a restoration dry-cleaning

business using its system and licensed marks. 511 F.3d at 538. The agreement

contained a non-competition clause requiring appellees to cease all restoration dry-

cleaning activities for a specified period of time and within a specified geographic region

upon termination of the franchise agreement. *Id.* at 538-39. The plaintiff terminated the

franchise agreement after the defendants failed to make payments. *Id.* at 539. It then

discovered the defendants continued some restoration dry-cleaning services, in

violation of the non-compete clause. *Id.* The plaintiff filed suit for breach of the non-

compete clause in the franchise agreement, and sought a preliminary injunction. *Id.*

The district court denied the motion for preliminary injunction and the plaintiff appealed.

*Id.* at 540.

The Sixth Circuit reversed and remanded the case with instructions to issue the

requested injunction. *Id.* at 554. In so holding, the Sixth Circuit determined that the

defendants' breach of the non-compete agreement caused harm that was difficult to

24

place a precise figure on.  *Id.* at 550.  It observed:

> The likely interference with customer relationships *resulting from the breach of a non-compete agreement* is the kind of injury for which monetary damages are difficult to calculate.  "The loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute.  Similarly, the loss of fair competition that results from the breach of a non-competition covenant is likely to irreparably harm an employer."...Such injuries are precisely what Plaintiff will suffer if Defendants are allowed to continue to breach the franchise agreement's non-compete clause.  Accordingly, we find that Plaintiff would likely suffer an irreparable injury without the issuance of the preliminary injunction.

*Id.* (quoting *Basicomputer*, 973 F.2d at 512) (emphasis added).

OTG is correct that this reasoning is applicable only in the breach of a non-compete agreement context.  In such cases, it is impossible for courts to calculate how much business the breaching party is taking from the non-breaching party by wrongfully competing with it.  Here, on the other hand, Nextep's damages are readily computable as demonstrated by Nextep's ability to calculate how much it would charge OTG for the work given to other vendors.

Nextep's arguments to the contrary are fruitless.  Nextep says it will lose "a branding and marketing opportunity within the entire domestic transportation industry," (Doc. # 32 at 10), yet it admits that it contracted away its right to brand its products as its own, giving OTG the right to re-brand those products. (*See* Doc. # 21-3 ¶ 3).  Nextep made the novel argument, at the hearing on the preliminary injunction motion, that the loss to reputation and recognition will come from its inability to communicate to other companies interested in its products and services that it is the exclusive vendor for OTG.  However, the Addendum only requires OTG to contract with Nextep exclusively if two vague conditions are met.  OTG's obligations under the agreement are not

25

unlimited and any harm flowing to Nextep likely results from the wording of the Addendum, not the conduct of OTG.

Finally, the facts of this case are not equivalent to the breach of a non-compete clause case; rather, they are similar to cases where an individual loses his job as a result of the defendant's allegedly wrongful conduct.  In that context, the Sixth Circuit holds, "[t]he fact that an individual may lose his income for some extended period of time does not result in irreparable harm, as income wrongly withheld may be recovered through monetary damages in the form of back pay." *Overstreet*, 305 F.3d at 579 (citing cases).  "Indeed, 'the loss of a job is quintessentially reparable by money damages.'" *Id.* (quoting *Minnesota Ass'n of Nurse Anesthetists v. Unity Hosp.*, 59 F.3d 80, 83 (8th Cir. 1995)); *see also Merrill Lynch*, 403 F.Supp. at 343 (mere loss of profits or relative deterioration of competitive position do not in themselves suffice to establish irreparable injury as a basis for preliminary injunctive relief).

This factor weighs in favor of OTG.

### 3. The harm caused by a preliminary injunction to the third-party vendors, Delta Airlines, OTG, and the public outweighs the harm to Nextep.

The third preliminary injunction consideration is "whether issuance of the injunction would cause substantial harm to others."  *Tumblebus*, 399 F.3d at 760.  "In considering this factor, the Court must (1) balance the harm Plaintiff would suffer if its request for a preliminary injunction were denied against the harm Defendant would suffer if an injunction were to issue, and (2) assess the impact the preliminary injunction might have on relevant third parties."  *Proctor & Gamble Co. v. Georgia-Pacific Consumer Prods. LP*, No. 1:09-318, 2009 WL 2407764, at *10 (S.D. Ohio Aug. 3,

26

2009).

Nextep acknowledges that Control Group might be affected by an injunction but suggests that OTG cannot use this as a "bootstrap" to support its position.  OTG says that Control Group and Delta Airlines ("Delta") will be harmed by cancellation of the OTG-Control Group contract.  It contends Delta will be affected "through possible delays or cancellation of the underlying agreement to provide the iPads at its New York and Minneapolis terminals."  (Doc. # 35 at 14).  OTG emphasizes that it will also suffer significant harm if the Court issues an injunction.  It says, "[g]ranting Nextep's requested relief would force OTG to incur extraordinary additional expense, and cause OTG possibly to breach its obligations to Control Group, Fending Group and Delta Airlines." (*Id.* at 14-15).

OTG makes the better argument; this factor weighs against issuance of a preliminary injunction.  The Court acknowledges that some harm will come to Nextep if OTG proceeds with the RFP project using Control Group while the litigation is pending; however, as already discussed, that harm is not irreparable and can be ameliorated with money damages.  On the other hand, OTG will be harmed if the Court issues an injunction because it may be liable to Fending Group, Control Group, and Delta for breach of contract.  *See, e.g.*, *Cunningham v. Adams*, 808 F.2d 815, 822 (11th Cir. 1987) (holding that the district court did not abuse its discretion in ruling that the harm to the defendant in the form of potential liability for breach of contract with a third party outweighed harm to the plaintiff if defendant was not enjoined from carrying out the allegedly unlawfully-awarded contract); *Greer v. Detroit Pub. Sch.*, No. 10-14623, 2011 WL 196928, at *5 (E.D. Mich. Jan 18, 2011) ("Defendant would likely have to either pay

27

wages for both the subcontracted security officers and Plaintiffs, or only Plaintiffs, or

pay damages for breaching its contract with the sub-contracted security officers.").

There is some merit to Nextep's contention that OTG should not benefit from

self-inflicted harm that would result from the issuance of a preliminary injunction. *See*

*Proctor & Gamble*, 2009 WL 2407764, at *10 ("[T]he Court is [ ] aware that any

essentially self-inflicted harm to Defendant that could result from issuance of preliminary

injunctive relief should not excuse any improper actions by the company so as to

preclude an injunction."); *Midwest Guaranty Bank v. Guaranty Bank*, 270 F.Supp.2d

900, 924 (E.D. Mich. 2003) ("Guaranty cannot place itself in harms way, and then later

claim that an injunction should not issue because of costs which it must incur in order to

remedy its own misconduct.").  OTG potentially placed itself in harms way by

proceeding with the RFP process and contracting with Delta and Control Group over

Nextep's objections, while a suit seeking injunctive relief was pending.  However, for the

reasons stated in the Court's discussion of the merits of Nextep's claim, OTG makes a

good argument for why it believed it was not violating the Addendum or otherwise

engaging in wrongdoing.  Thus, this contention does not tip the scale in Nextep's favor.

Furthermore, the Court must consider the impact a preliminary injunction would

have on third parties.  The Court is persuaded that Control Group would be harmed by a

preliminary injunction because it would be prohibited from working on the RFP project,

and presumably from receiving payment under the contract.  Likewise, Delta would be

harmed by delays in implementation of the self-order iPad project at airports in New

York and Minnesota.  Finally, the public would be harmed if the injunction issues by the

deprivation of the self-order kiosks at these airports during the pendency of the

litigation.  *See Cunningham*, 808 F.2d at 822 (considering the harm to the public if they are deprived of an operating airport concession during the pendency of the litigation).

The Court notes that the purpose of a preliminary injunction is to maintain the status quo at the time the request for preliminary injunctive relief is made.  However, to grant Nextep's injunction request would disrupt the status quo; preparation for the project, and possibly implementation, is underway.  *See Merrill Lynch*, 403 F.Supp. at 344.

### 4. The public has an interest in the products and services OTG contracted with Control Group to provide and their interest would not be served by issuance of the injunction.

The final factor the Court must consider is "whether the public interest would be served by issuance of the injunction."  *Tumblebus*, 399 F.3d at 760.  Nextep argues this factor favors issuance of a preliminary injunction because of the "general public interest in the enforcement of voluntarily assumed contractual obligations."  (Doc. # 32 at 11).  OTG argues the injunction would not serve the public interest because it would "prevent the public from enjoying the use of advanced iPad self-ordering devices at public facilities that have combined traffic in the millions each year."  (Doc. # 35 at 16).

This factor does not favor issuance of a preliminary injunction.  While "[e]nforcement of contractual duties is in the public interest," *Tenke*, 511 F.3d at 551, it is not clear at this stage that OTG breached contractual duties to Nextep.  Moreover, the Court agrees with OTG; the public has an interest in the use, as soon as possible, of the products and services OTG contracted with Control Group to provide at airports in New York and Minnesota.  *See Cunningham*, 808 F.2d at 822.

29

**V.      CONCLUSION**

None of the factors the Court must evaluate when deciding whether to issue a preliminary injunction favors its issuance.  Consequently, Nextep does not meet its burden to show the circumstances clearly demand an injunction.

The Court **DENIES** Nextep's motion.

**IT IS ORDERED.**


S/Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated:  September 7, 2011

The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on September 7, 2011.

S/Linda Vertriest
Deputy Clerk

30